**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
DAVID WOOD,                             )
                                        )
            Plaintiff,                  )
                                        )
      v.                                ) Civil Action No. 14-2066 (EGS)
                                        )
DISTRICT OF COLUMBIA, *et al.*,         )
                                        )
            Defendants.                 )
_____)

### MEMORANDUM OPINION

David Wood brings this action against the District of
Columbia and Metropolitan Police Department officers Charles
Kiel, Charandip Sekhon, Andrew Smith, Michael Rodd, Jonathan
Rosnick, Daniel Chodak, Jason Bagshaw, and Alicia Carter. His
claims arise from an altercation he had with several of the
defendant officers that occurred in the front yard of his home
the evening of October 27, 2013 and from his subsequent
prosecution on charges of assault on a police officer ("APO").
His complaint alleges various common law tort claims, including
assault, false arrest, abuse of process, malicious prosecution,
and negligent training and supervision, and that the officers
violated federal law under 42 U.S.C. § 1983 when they falsely
arrested him, used excessive force against him, maliciously
prosecuted him, and prosecuted him based on false evidence.
Pending before the Court is defendants' motion for summary

judgment. Upon review of defendants' motion, the response and reply thereto, the parties' supplemental filings, the applicable law, and the entire record, defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.    Background

### A.    Factual Background

Around 8:00 p.m. on the evening of October 27, 2013, Officers Charles Kiel, Andrew Smith, Charandip Sekhon, Michael Rodd, and Jonathan Rosnick were in a 7-Eleven convenience store on South Dakota Avenue in Northeast Washington, D.C. when a woman entered the store and alerted them that a taxi cab driver was being assaulted and robbed on nearby Jamaica Street. Defs.' Statement of Material Facts ("Defs.' SMF"), ECF No. 43 ¶ 1; Deposition of Charles Kiel ("Kiel Dep."), ECF No. 43-4 at 8:14-18; Deposition of Charandip Sekhon ("Sekhon Dep."), ECF No. 43-7 at 10:1-8; Deposition of David Wood ("Wood Dep."), ECF No. 43-9 at 22:7-9. The officers immediately reported to Jamaica Street, saw a taxi cab parked in the road with its door open, and then saw a person——whose face was bloodied——on the street calling for help. Defs.' SMF, ECF No. 43 ¶¶ 2, 10. That person was the cab's driver, Minwiylte Gebyehu, who had been attacked and robbed by his passenger and a second assailant who entered the cab on Jamaica Street after the passenger had instructed Mr. Gebyehu to

stop the cab on that street. *Id.* ¶ 41; Gebyehu Aff., ECF No. 45-8 at 1-2.

Mr. Gebyehu communicated to the officers that two persons had attacked him. Kiel Dep., ECF No. 43-4 at 12:6-8. But the record is not clear as to what exactly Mr. Gebyehu communicated to the officers regarding where the two assailants fled. According to the officers, Mr. Gebyehu, when asked where his assailants fled, pointed to a specific house located at 1214 Jamaica Street⸺the house in which Mr. Wood lived with his mother and from which he was soon to emerge. Kiel Dep., ECF No. 43-4 at 11:1-3, 12:6-8; Deposition of Michael Rodd ("Rodd Dep."), ECF No. 43-5 at 11:2-4; Deposition of Jonathan Rosnick ("Rosnick Dep."), ECF No. 43-6 at 13:1-3, 15:10-12; Sekhon Dep., ECF No. 43-7 at 12:11-17; Deposition of Andrew Smith ("Smith Dep."), ECF No. 43-8 at 13:17-22. Additionally, in an affidavit provided to the Court by Mr. Wood, Mr. Gebyehu affirmed that he showed the officers who arrived on the scene the house that his assailant-passenger had indicated was his house on Jamaica Street. Gebyehu Aff., ECF No. 45-8 at 3. But Mr. Gebyehu's testimony from Mr. Wood's criminal trial is in tension with this evidence. At one point during his testimony, Mr. Gebyehu said that he did not see where his assailants fled and that he told the officers as much when they asked him where his assailants had gone. Aug. 1, 2014 Criminal Trial Tr., ECF No. 45-3 at 19:2-

3

10. However, at another point during his testimony, Mr. Gebyehu seems to have said that he did point out a specific house to the officers: the house in front of which he had parked his cab. *Id.* at 29:1-15. Mr. Wood contends that if Mr. Gebyehu *did* identify a specific house for the officers, the house identified could not have been his at 1214 Jamaica Street, as the cab was not parked in front of his house. Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp."), ECF No. 45 at 10 n.2. The officers' testimony as to the location of the cab in relation to 1214 Jamaica Street is inconsistent. *Compare* Kiel Dep., ECF No. 43-4 at 11:12-14 ("Q: Where was his cab in relation to the [1214 Jamaica Street] house? A: About two to three doors down, closer to Eastern Avenue."), *with* Rosnick Dep., ECF No. 43-6 at 14:21-15:6 ("Q: So how did it come about that you were almost in front of the [1214 Jamaica Street] home? A: We were, again, we were walking from Eastern back towards the scene of the event where the cab was. . . . And [Mr. Gebyehu] had indicated that the two men that had assaulted him had ran into that home, and pointed towards it.").

Whatever directional information Mr. Gebyehu actually conveyed to the officers, Officers Kiel, Sekhon, and Smith ended up walking towards Mr. Wood's house at 1214 Jamaica Street, while Officers Rodd and Rosnick remained in the street with Mr. Gebyehu. Defs.' SMF, ECF No. 43 ¶ 4; Rosnick Dep., ECF No. 43-6 at 19:6-8, 22:16-18. Inside the living room of the house, Mr.

Wood, who had "had a few drinks," Wood Dep., ECF No. 43-9 at 22:2-3, was on the telephone when he saw a red streak reflect on his television screen. Defs.' SMF, ECF No. 43 ¶ 33; Wood Dep., ECF No. 43-9 at 13:8-10. Thinking that the flashing red light could have been from an emergency vehicle arriving for a beloved elderly neighbor, Mr. Wood——after jumping up and unsuccessfully attempting to reach his neighbor by telephone——exited the house, heading to his neighbor's house to check on her. Wood Dep., ECF No. 43-9 at 17:1-3, 19:8-9, 20:7-22; Pl.'s Answers to Defs.' Interrogs., ECF No. 45-10 at 9.

When Mr. Wood exited his house he was clad in just his underwear and a tee shirt and was "worried" and "panicking." Defs.' SMF, ECF No. 43 ¶ 15; Wood Dep., ECF No. 43-9 at 13:18-14:1, 19:4-6; Sekhon Dep, ECF No. 43-7 at 18:5. Officer Rosnick observed that Mr. Wood had "an agitated character and expression," Rosnick Dep., ECF No. 43-6 at 25:6-7, and Officer Kiel observed that Mr. Wood "had a very confused something-was-wrong-with-him look in his eyes" and "appeared to be under the influence of some kind of substance." Defs.' SMF, ECF No. 43 ¶ 17; Kiel Dep., ECF No. 43-4 at 15:7-8, 17:18-19. Officer Kiel identified himself as a police officer and told Mr. Wood that he needed to stop and speak with the officers in view of the assault and robbery that had just occurred nearby, Kiel Dep., ECF No. 43-4 at 15:16-20, 16:20-17:10; Sekhon Dep., ECF No. 43-7

at 18:14-19:8; Smith Dep., ECF No. 43-8 at 19:10-20, but, according to the officers, Mr. Wood refused to stop and speak with them. Kiel Dep., ECF No. 43-4 at 17:3-4, 18:15; Sekhon Dep., ECF No. 43-7 at 25:7-26:18; Smith Dep., ECF No. 43-8 at 19:16-20:4. Mr. Wood maintains that at this point——prior to Officer Kiel grabbing him and handcuffing one of his arms——he was unaware of any police presence. Wood Dep., ECF No. 43-9 at 17:10-17, 21:1-22:1.

Officer Kiel told Mr. Wood that he would have to handcuff him and proceeded to grab and handcuff one of Mr. Wood's arms. Kiel Dep., ECF No. 43-4 at 18:15-18, 20:7-8; Rosnick Dep., ECF No. 43-6 at 26:17-18; Sekhon Dep., ECF No. 43-7 at 27:3-22; Smith Dep., ECF No. 43-8 at 20:6-7. Now aware of the officers' presence, Wood Dep., ECF No. 43-9 at 17:10-15, Mr. Wood contends that, upon being grabbed, he told Officer Kiel to "stop" and raised his hand to Officer Kiel to indicate that he should stop grabbing him. Wood Dep., ECF No. 43-9 at 17:1-7, 22:18-24:5. According to the officers, Mr. Wood did not merely raise his hand to indicate that they should "stop"; rather, he swung at Officer Kiel right after Officer Kiel had secured one of his arms in handcuffs. Kiel Dep., ECF No. 43-4 at 21:7-10; Rosnick Dep., ECF No. 43-6 at 31:2-5; Sekhon Dep., ECF No. 43-7 at 31:7-22; Smith Dep., ECF No. 43-8 at 24:19-21.

Whether Mr. Wood merely raised his hand at Officer Kiel or
swung at him, at about the same time or immediately after
Officer Sekhon commanded Mr. Wood, "On the ground,
motherfucker," to which Mr. Wood responded by telling Officer
Sekhon, "Don't try it, Junior." Wood Dep., ECF No. 43-9 at
22:21-23:4. Telling Mr. Wood not to call him "Junior," Officer
Sekhon then "ram[med] himself into [Mr. Wood]," tackling Mr.
Wood with the help of Officers Kiel and Smith. *Id.* at 14:9-13,
23:5-10. A melee ensued during which the officers punched,
pulled, stepped on, and kicked Mr. Wood. *Id.* at 14:14-20, 23:5-
10, 25:8-26:7; Sekhon Dep., ECF No. 43-7 at 42:1-22; Smith Dep.,
ECF No. 43-8 at 28:15-29:21. Soon after the struggle began,
Officers Rodd and Rosnick ran over to assist the three other
officers. Rosnick Dep., ECF No. 43-6 at 33:11-14. Officer Rodd
was able to grab ahold of Mr. Wood's free arm and pull it behind
his back so that it could be handcuffed. Defs.' SMF, ECF No. 43
¶ 9; Rodd Dep., ECF No. 43-5 at 33:14-34:1. Although Mr. Wood
insists that he "[c]ouldn't struggle" because of the handcuffs,
Wood Dep., ECF No. 43-9 at 27:1-2, he concedes that during the
melee he was hitting the officers while they were hitting him.
Wood Dep., ECF No. 43-9 at 26:10-16 ("Q: And while they were
hitting you, where were your hands? A: Well, I was hitting——they
were hitting me at one point, my hands were in front of me. They
put them behind me. They grabbed them, they're pulling it, they

yanked and pulled and then put them in handcuffs."). After Mr.
Wood was handcuffed and subdued, he contends that the officers
continued to punch, kick, and step on him. *Id.* at 15:4-6 ("I was
handcuffed and I remember one of the officers just punching me
and punching me."), 23:13-15 ("[W]hen I was on the ground they
had me in handcuffs and still were still stepping on me,
punching me."). The officers maintain that any use of force
ceased once Mr. Wood was fully handcuffed. Kiel Dep., ECF No.
43-4 at 35:10-15 ("A: At some point we were able to handcuff
him. Yes. Q: And then what happened? A: We all immediately got
off of him, assessed what the rest of the situation, and carried
on with the investigation.").

Officer Daniel Chodak arrived on the scene after the melee
was in progress but stayed on the street with Mr. Gebyehu
throughout its duration. Defs.' SMF, ECF No. 43 ¶¶ 24-26. During
a subsequent show-up procedure that occurred after Sergeants
Jason Bagshaw and Alicia Carter arrived on the scene, Mr.
Gebyehu did not identify Mr. Wood as one of his assailants. *Id.*
¶¶ 28-31; Deposition of Jason Bagshaw, ECF No. 43-1 at 15:1-3.
Mr. Wood was then transported from the scene to a police station
house and eventually taken to a hospital to receive medical
attention for atrial fibrillation, an accelerated heart rate,
post-concussive syndrome, and injuries to his head and shoulder.
Defs.' SMF, ECF No. 43 ¶ 39; Pl.'s Opp., ECF No. 45 at 4.

**B.    Procedural Background**

Mr. Wood was subsequently charged with misdemeanor APO but, following a bench trial on July 31 and August 1, 2014 in the Superior Court of the District of Columbia, was found not guilty. Defs.' SMF, ECF No. 43 ¶ 40; Criminal Trial Docket Sheet, ECF No. 45-9. On October 24, 2014, Mr. Wood commenced this lawsuit in the Superior Court alleging: (1) common law assault against all defendants (Counts I and II); (2) common law false arrest against all defendants (Counts III and IV); (3) common law abuse of process against all defendants (Counts V and VI); (4) common law malicious prosecution against all defendants (Counts VII and VIII); (5) excessive force in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, against all individual officers (Count IX); (6) false arrest in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, against all individual officers (Count X); (7) prosecution based on false evidence in violation of unspecified civil rights, pursuant to 42 U.S.C. § 1983, against all individual officers (Count XI); (8) malicious prosecution in violation of the Fourth and Fifth Amendments, pursuant to 42 U.S.C. § 1983, against all individual officers (Count XII); and (9) negligent training and supervision against the District of Columbia (Count XIII). *See* Compl., ECF No. 19-1 ¶¶ 39-87.

Defendants removed the case to this Court on December 5, 2014. *See* Joint Notice of Removal, ECF No. 1. The Court partially granted Officer Chodak's motion to dismiss, dismissing Counts I, V, IX, and XI as to him. Order, ECF No. 27. On December 23, 2015, defendants filed the motion for summary judgment that is presently before the Court. *See* Defs.' Mot. for Summ. J., ECF No. 43. In his brief in opposition, Mr. Wood expressly abandons and requests the Court to dismiss the following claims: all Counts as to Officers Bagshaw and Carter, and Counts V, VI, XI, and XIII in full. Pl.'s Opp., ECF No. 45 at 1 n.1. The Court thus grants defendants' motion as to those abandoned claims and has considered the parties' summary judgment arguments as they pertain to the remaining claims.

## II. Legal Standards

### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). The moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323
(1986) (internal quotation marks omitted). To defeat summary
judgment, the nonmoving party must demonstrate that there is a
genuine issue of material fact. *Id.* at 324. A material fact is
one that is capable of affecting the outcome of the litigation.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A
genuine dispute is one where "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
*Id.* Further, in the summary judgment analysis "[t]he evidence of
the non-movant is to be believed, and all justifiable inferences
are to be drawn in his favor." *Id.* at 255.

### B. Qualified Immunity

Section 1983 provides a private cause of action against
persons acting under color of District of Columbia law who
deprive another of his or her federal constitutional or
statutory rights. 42 U.S.C. § 1983. However, the doctrine of
qualified immunity "exists to protect officers 'from undue
interference with their duties and from potentially disabling
threats of liability.'" *Lash v. Lemke*, 786 F.3d 1, 5 (D.C. Cir.
2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).
"In resolving questions of qualified immunity at summary
judgment, courts engage in a two-pronged inquiry." *Tolan v.
Cotton*, 134 S. Ct. 1861, 1865 (2014). The first prong asks
"whether the facts, [t]aken in the light most favorable to the

party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Id.* (internal quotation marks omitted). The second asks "whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "To be clearly established, the precedent must give officials clear warning of unconstitutional conduct." *Doe v. District of Columbia*, 796 F.3d 96, 104 (D.C. Cir. 2015) (internal quotation marks omitted). "In determining whether officers strayed beyond clearly established bounds of lawfulness, [this Court] look[s] to cases from the Supreme Court and [the D.C. Circuit], as well as to cases from other courts exhibiting a consensus view." *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008). Although courts have discretion to decide the order in which to engage the two prongs of the qualified immunity analysis, *Tolan*, 134 S. Ct. at 1866 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)), under either prong "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.*

## III. Analysis

Mr. Wood's remaining claims arise under § 1983 and several common law torts. Under § 1983, he claims the officers violated his constitutional rights by falsely arresting him, maliciously prosecuting him, and using excessive force against him. *See*

Compl., ECF No. 19-1 ¶¶ 67-76, 80-83. His tort claims are false arrest, malicious prosecution, and assault. *Id.* ¶¶ 39-54, 61-66. The Court will address these claims below.

**A.    § 1983: False Arrest and Malicious Prosecution**

Mr. Wood contends that there was no reasonable, articulable suspicion to permit the officers to initially stop him, Pl.'s Opp., ECF No. 45 at 10-11 & n.2, and that the probable cause required for an arrest never materialized during his interaction with the officers. *Id.* at 10-13. Accordingly, he argues that the officers falsely arrested him in violation of his Fourth Amendment rights. *Id.* at 12-13. Defendants counter that the totality of the circumstances gave rise to the reasonable suspicion required for an initial investigatory stop, Defs.' Reply, ECF No. 48 at 2-4, and that, based on Mr. Wood's resistant conduct during that lawful stop, they had probable cause to arrest him for APO or, in the alternative, they are shielded by qualified immunity because it was not unreasonable for them to believe that they had probable cause to arrest him for APO. Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem. Supp."), ECF No. 43 at 26-28; *id.* at 4.

As a preliminary matter, the Court concludes that, when considering only the facts not in dispute and when drawing all reasonable inferences in Mr. Wood's favor, the officers had the reasonable, articulable suspicion required to permissibly

13

effectuate an investigatory stop of Mr. Wood.[1] Defendants do not

dispute that Mr. Wood was "seized" for Fourth Amendment purposes

when Officer Kiel grabbed one of his arms and handcuffed it. *See*

*Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("Only when the

officer, by means of physical force or show of authority, has in

some way restrained the liberty of a citizen may we conclude

that a 'seizure' has occurred."). The inquiry then becomes

whether that initial stop was constitutionally justified.

Officers are permitted to conduct a warrantless investigatory——

or "*Terry*"——stop "so long as they have 'reasonable, articulable

suspicion' of criminal conduct." *United States v. Goddard*, 491

F.3d 457, 460 (D.C. Cir. 2007) (citing *Illinois v. Wardlow*, 528

---

[1] Mr. Wood does not assert a stand-alone § 1983 Fourth Amendment
claim of an unlawful seizure arising from the initial stop, *see
generally* Compl., ECF No. 19-1, and instead limits his § 1983
claims to those of false arrest, malicious prosecution, and
excessive force. *See id*. ¶¶ 67-76, 80-83. Even so, "[a] court
may deny a motion to dismiss or for summary judgment on the
basis of a legal theory never embraced by the plaintiff, as long
as that theory is supported by the facts alleged and as long as
the defendant is not prejudiced on the merits." *Hanson v.
Hoffmann*, 628 F.2d 42, 53 n.11 (D.C. Cir. 1980) (internal
citations omitted). Here, denying summary judgment as to an
unlawful seizure claim based on the initial investigatory stop
would not prejudice the officers because they have not been
taken by surprise; in their briefing, they addressed the
legality of the initial stop, in addition to addressing the
other claims that Mr. Wood has explicitly articulated. *See*
Defs.' Reply, ECF No. 48 at 2-4 (arguing that the officers had
the reasonable, articulable suspicion required for an
investigatory stop). For this reason, and because analysis of
the false arrest claim benefits from a preliminary analysis of
the initial investigatory stop, the Court scrutinizes the
propriety of the initial stop.

U.S. 119, 123 (2000)). This determination depends on an assessment of the totality of the circumstances "as viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Bailey*, 622 F.3d 1, 6 (D.C. Cir. 2010) (internal quotation marks omitted). In this totality of the circumstances analysis, "factors individually susceptible to an innocent explanation may suffice[ ] to form a particularized and objective basis when taken together." *United States v. Castle*, 825 F.3d 625, 634-35 (D.C. Cir. 2016) (internal quotation marks omitted). Further, a *Terry* stop only requires that "officers have a 'minimal level of objective justification.'" *Goddard*, 491 F.3d at 460 (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

Here, there is a factual dispute as to whether Mr. Gebyehu told the officers that his assailants fled to Mr. Wood's house; told them that they fled to a different house on Jamaica Street; or told them nothing regarding the whereabouts of his assailants. *Compare* Aug. 1, 2014 Criminal Trial Tr., ECF No. 45-3 at 19:2-10, *with* Kiel Dep., ECF No. 43-4 at 11:1-3. Even so, there is no dispute that a violent crime had occurred on Jamaica Street in the immediate vicinity of the home from which Mr. Wood emerged, Defs.' SMF, ECF No. 43 ¶¶ 1-2; that the crime was perpetrated by two persons, Kiel Dep., ECF No. 43-4 at 12:6-8; that the altercation between Mr. Wood and the officers occurred

at night, Wood Dep., ECF No. 43-9 at 22:7-9 ("Q: And about what time did this all occur? A: I would say around, say, 8:00."); that Mr. Wood was "panicking" and "worried" when he exited his house to check on his neighbor after seeing a flashing red light from his living room, Wood Dep., ECF No. 43-9 at 13:8-14:2; and that Officer Kiel——the officer who initiated the investigatory stop——noted that Mr. Wood, clad in only underwear and a tee shirt, "appeared to be under the influence of some kind of substance" and "had a very confused something-was-wrong-with-him look in his eyes." Kiel Dep., ECF No. 43-4 at 15:7-10, 17:18-19.

The Court concludes that the undisputed facts are sufficient to sustain a finding of reasonable, articulable suspicion here because "[a]lthough an officer does not have articulable suspicion a person is committing a crime merely because a person is in an area of suspected criminal activity, 'officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" *Bailey*, 622 F.3d at 5-6 (quoting *Wardlow*, 528 U.S. at 124). Thus "[a]n officer may initiate a *Terry* stop based not on certainty but on the need 'to 'check out' a reasonable suspicion.'" *Id.* at 6 (quoting *United States v. Clark*, 24 F.3d 299, 303 (D.C. Cir. 1994)). The scenario that confronted Officer Kiel and his fellow officers is a quintessential example of one

where it was necessary to at least "check out" Mr. Wood to dispel their suspicion that he was connected to the crime that they were responding to. When Mr. Wood emerged from his house in the immediate vicinity of the crime that had been committed, the officers were searching for two suspects, and the officers' observation of Mr. Wood's strange conduct and appearance—— consistent with his own description that he was "worried" and was "panicking" when he emerged from his house, Wood Dep., ECF No. 43-9 at 13:8-14:2——was enough to permit them to effectuate an investigatory stop to dispel their suspicion. *See United States v. Brown*, 334 F.3d 1161, 1165-68 (D.C. Cir. 2003) (holding that there was reasonable suspicion for an investigatory stop of persons in a car in a high crime area when the car was only one of two occupied cars in a parking lot where gunshots had recently been fired, a person that exited the car engaged in "peculiar" behavior, and the persons remaining in the car engaged in "furtive movements"). Although Officer Kiel and his fellow officers only barely passed the reasonable suspicion threshold, based on Mr. Wood's panicked demeanor in the immediate vicinity of a violent crime they had the "'minimal level of objective justification'" needed to effectuate an investigatory stop. *See Goddard*, 491 F.3d at 460 (quoting *Delgado*, 466 U.S. at 217). Certainly Mr. Wood's conduct was "'ambiguous and susceptible of an innocent explanation,'" but

"'*Terry* recognized that . . . officers could detain [such] [an] individual[ ] to resolve the ambiguity.'" *Brown*, 334 F.3d at 1168 (quoting *Wardlow*, 528 U.S. at 125-26).[2]

That the officers had the reasonable suspicion required to effectuate an initial investigatory stop of course does not end the Court's inquiry, as at some point the investigatory stop morphed into an arrest, and an arrest requires not mere reasonable suspicion but rather probable cause. *Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987). "Probable cause

---

[2] Although the Court concludes that there was reasonable suspicion justifying an investigatory stop, to the extent that there was not, defendants are still entitled to summary judgment on any claim of an unlawful seizure arising from the initial stop of Mr. Wood under the second prong of the qualified immunity analysis. That prong entitles defendants to immunity so long as the violation in question was not "clearly established." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks omitted). "In determining whether officers strayed beyond clearly established bounds of lawfulness, [this Court] look[s] to cases from the Supreme Court and [the D.C. Circuit], as well as to cases from other courts exhibiting a consensus view." *Johnson*, 528 F.3d at 976. Mr. Wood fails to cite a single case from the Supreme Court or the D.C. Circuit that clearly establishes the absence of reasonable suspicion under factual circumstances generally similar to those that are undisputed in his case. *See generally* Pl.'s Opp., ECF No. 45. And though Mr. Wood does not cite to any out-of-Circuit cases relevant to this analysis, the Court's own research indicates the absence of any consensus view. *Compare United States v. Williams*, 11 F. App'x 842, 843-44 (9th Cir. 2001) (holding that there was no reasonable suspicion when the person stopped was in the vicinity of a crime scene and "looked nervously back at the crime scene"), *with United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (explaining that there was reasonable suspicion when the person stopped matched a highly generalized description of the suspect and was less than a mile from the scene of a robbery when the streets were nearly deserted).

exists if a reasonable and prudent police officer would conclude from the totality of the circumstances that a crime has been or is being committed." *United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993). Like the reasonable suspicion inquiry, the probable cause inquiry is an objective one that assesses "the facts and circumstances known to the officers at the time of the arrest without regard to the 'actual motivations' or '[s]ubjective intentions' of the officers involved." *United States v. Bookhardt*, 277 F.3d 558, 565 (D.C. Cir. 2002) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Mr. Wood maintains that the probable cause required for an arrest was absent. Pl.'s Opp., ECF No. 45 at 12-13. Defendants counter, as indicated above, that Mr. Wood's Fourth Amendment false arrest claim must fail because there was probable cause to arrest him for APO or, in the alternative, because they had the reasonable belief that they had probable cause to arrest him for APO. Defs.' Mem. Supp., ECF No. 43 at 26-28. Defendants' fallback qualified immunity argument thus relies on the well-settled rule that "law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation marks omitted).

The D.C. APO statute applicable here directs that anyone who, "without justifiable and excusable cause, assaults,

resists, opposes, impedes, intimidates, or interferes with a law

enforcement officer on account of, or while that law enforcement

officer is engaged in the performance of his or her official

duties shall be guilty of a misdemeanor." D.C. Code § 22-405(b).[3]

And even when an investigatory stop or arrest is unlawful, a

person does not have justifiable and excusable cause to use

force to resist that stop or arrest when he knows it is being

carried out by a law enforcement officer. *See id.* § 22-405(d).

To "constitute an offense under [the APO statute], a person's

conduct must go beyond speech and mere passive resistance or

avoidance, and cross the line into active confrontation,

obstruction or other action directed against an officer's

performance in the line of duty." *Howard v. United States*, 966

A.2d 854, 856 (D.C. 2009) (quoting *In re C.L.D.*, 739 A.2d 353,

357 (D.C. 1999)). The "key is the active and oppositional nature

of the conduct for the purpose of thwarting a police officer in

his or her duties." *Id.* (quoting *C.L.D.*, 739 A.2d at 357).

Defendants argue that there was probable cause for an APO

arrest or that it was at least reasonable to conclude that such

---

[3] The current version of D.C.'s APO statute——which became
effective on June 30, 2016, well after the events in question
here——reads as follows: "Whoever without justifiable and
excusable cause assaults a law enforcement officer on account
of, or while that law enforcement officer is engaged in the
performance of his or her official duties shall be guilty of a
misdemeanor . . . ." D.C. Code § 22-405(b).

probable cause existed because they contend that: Mr. Wood was walking away from the officers when they were approaching him on his front lawn; when he was grabbed by Officer Kiel he told the officers to "stop" and motioned at the officers to stop; he said, "Don't try it, Junior" when Officer Sekhon ordered that he fall to the ground; and, in the ensuing melee, he was hitting the officers at the same time that they were hitting him. Defs.' Mem. Supp., ECF No. 43 at 27-28; Defs.' Reply, ECF No. 48 at 4. Under those circumstances, the defendants contend that they had probable cause or a reasonable belief of probable cause for an APO arrest. Defs.' Mem. Supp., ECF No. 43 at 28. For his part, Mr. Wood only contends that because there is a dispute of fact as to whether Mr. Gebyehu directed the officers on the scene to Mr. Wood's house there was no probable cause for an arrest. Pl.'s Opp., ECF No. 45 at 12-13.

The Court finds that the officers had probable cause for an APO arrest, and thus they are entitled to summary judgment as to Mr. Wood's Fourth Amendment false arrest claim. There is no dispute that when Officer Kiel initially grabbed Mr. Wood as part of his investigatory stop Mr. Wood responded by saying "stop" and by raising his hand to the officers in a motion intended to emphasize that they should "stop" grabbing and handcuffing him. Wood Dep., ECF No. 43-9 at 22:18-22 ("One [officer] grabbed my arm, one tried to come at me. I said, stop,

you know."), 23:16-24:5 ("Q: So you raised your hand at the officer? A: Yeah. 'Stop.' You know. I don't have——as many medical injuries as I have, I'm not trying to get hurt anymore."). It is also undisputed that Mr. Wood then refused to go to the ground when Officer Sekhon ordered him to do so. *Id.* at 22:21-23:6 ("I said, stop, you know. And then the other one . . . he came up to me and said, 'On the ground, motherfucker.' I then said, 'Don't try it, Junior.' And he said, 'Don't call me Junior.' And then they all just grabbed me."). Because probable cause for an APO arrest requires an arrestee's conduct to "go beyond speech and mere passive resistance or avoidance, and cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty," *Howard*, 966 A.2d at 856 (quoting *C.L.D.*, 739 A.2d at 357), the Court is uncertain as to whether Mr. Wood's refusal to go to the ground during the course of the investigatory stop when commanded to do so provides probable cause for an APO arrest. *Compare Howard*, 966 A.2d at 856-57 (holding that a defendant engaged in only passive resistance when she refused to remove her hands from her pockets when an officer ordered her to do so), *and CLD*, 739 A.2d at 357-58 (holding that a defendant engaged in only passive resistance when he refused to provide his name and walked away when an officer ordered him to state his name and not walk away), *with Cromartie v. District of*

*Columbia*, 479 F. App'x 355, 357 (D.C. Cir. 2012) (holding that there was probable cause for an APO arrest when a plaintiff "was belligerent, refused to obey instructions, and loudly cursed at the officers"), *and Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 84 (D.D.C. 2015) (holding that a plaintiff engaged in active confrontation when he "refused to get down on the ground as the officer commanded" and "refused to provide his loose arm to be handcuffed" during the course of an investigatory stop). Even so, when Officer Kiel initially grabbed Mr. Wood and began to handcuff him, Mr. Wood's raised hand motion to emphasize that he wanted the officers to "stop" was sufficiently "active confrontation" to give rise to probable cause for an APO arrest. In *In re J.S.*, 19 A.3d 328 (D.C. 2011), the D.C. Court of Appeals held that J.S. "actively resisted" officers' attempts to handcuff him when, while lying on the ground, he rolled his body from side to side and broke from an officer's grip by "swinging his arm forward." 19 A.3d at 332. The Court found that although J.S. did not assault the officers by swinging at them and his arm movement was motivated by pain rather than a specific intent to evade being handcuffed, that conduct still crossed the line from passive resistance into active confrontation. *Id.* at 331-33. Relying on its prior precedent, the Court said that "resisting handcuffing constitutes the type of active resistance directed against

23

police that is prohibited by the APO statute." *Id.* at 331
(citing *Coghill v. United States*, 982 A.2d 802, 805-06, 808
(D.C. 2009)). Here, there is a dispute as to whether Mr. Wood
swung at Officer Kiel, but there is no dispute that Mr. Wood at
least raised his hand to Officer Kiel to emphasize that he
should "stop" grabbing and handcuffing him. Mr. Wood's sudden
hand movement in response to Officer Kiel's attempt to grab and
handcuff him might be minimal resistance, but it is resistance
sufficiently analogous to J.S.'s "swinging his arm forward" to
sustain the conclusion that "active resistance directed against
police" had materialized, giving the officers probable cause to
arrest Mr. Wood for APO. *See id.* at 331-32.[4] Accordingly, because
the officers had probable cause to arrest Mr. Wood for APO, they
are entitled to summary judgment as to his Fourth Amendment
false arrest claim under the first prong of the qualified
immunity analysis. And because the officers had probable cause
to arrest Mr. Wood for APO, his § 1983 malicious prosecution
claim also fails. *See Pitt v. District of Columbia*, 491 F.3d

---

[4] Because the Court concludes that probable cause for an APO
arrest materialized when Mr. Wood told Officer Kiel to "stop"
and raised his hand to Officer Kiel to emphasize his desire that
he stop grabbing and handcuffing him, the Court has no need to
assess whether there was independently probable cause for an APO
arrest when Mr. Wood was exchanging blows with the officers in
the ensuing melee. *See* Wood Dep., ECF No. 43-9 at 26:10-13 ("Q:
And while they were hitting you, where were your hands? A: Well,
I was hitting——they were hitting me at one point, my hands were
in front of me.").

494, 511 (D.C. Cir. 2007) ("We join the large majority of circuits in holding that malicious prosecution is actionable under 42 U.S.C. § 1983 to the extent that the defendant's actions cause the plaintiff to be unreasonably 'seized' without probable cause, in violation of the Fourth Amendment.").

**B.    § 1983: Excessive Force**

Mr. Wood also claims that excessive force was used against him in violation of his Fourth Amendment rights during his altercation with the officers on his front lawn. Pl.'s Opp., ECF No. 45 at 6-10. Defendants argue that they did not use excessive force or that they were not clearly on notice that the amount of force that they used during the altercation was excessive. Defs.' Mem. Supp., ECF No. 43 at 21-25.

A claim of "excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [one's] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). That reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). Accordingly, the reasonableness analysis "requires careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Further, the objective reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Thus, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments——in circumstances that are tense, uncertain, and rapidly evolving——about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "[A] defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993).

In their altercation with Mr. Wood, the officers used force on four different occasions: first, when Officer Kiel initially grabbed Mr. Wood and handcuffed one of his arms; second, when Officers Sekhon, Kiel, and Smith tackled Mr. Wood to the ground; third, when Officers Sekhon, Kiel, Smith, Rodd, and Rosnick

struggled to subdue Mr. Wood with punches and grabs while he was "hitting" them in return; and fourth, when, according to Mr. Wood, punches and kicks were leveled against him after he had been fully handcuffed and subdued. Although the Court concludes that the first three uses of force here did not involve excessive force that was so apparent that no reasonable officer could have believed in the lawfulness of his actions, the last use of force——the alleged gratuitous, post-submission use of force——did involve that degree of egregiously excessive force. Accordingly, defendants are not entitled to summary judgment as to this version of Mr. Wood's excessive force claim.

First, it is undisputed that Officer Kiel grabbed and handcuffed one of Mr. Wood's arms as part of his investigatory stop. Kiel Dep., ECF No. 43-4 at 20:5-8; Wood Dep., ECF No. 43-9 at 17:3-5. But the right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Officer Kiel's grabbing and handcuffing of Mr. Wood's arm to effectuate the investigatory stop was not excessive because the stop was justified based on Mr. Wood appearing in the immediate vicinity of the scene of a violent crime with a panicked appearance when the officers were canvassing for the two perpetrators of the crime. *See supra* Part III.A. Under those circumstances, it was reasonable for Officer

Kiel to restrain Mr. Wood's arms by means of handcuffs until his suspicions about him could be dispelled. *See Cotton v. District of Columbia*, 541 F. Supp. 2d 195, 203-05 (D.D.C. 2008) (holding that an officer did not use excessive force when he pushed the plaintiff to the ground and placed her in handcuffs during an investigatory stop even though bystanders had already informed the officer that the plaintiff's knife-wielding assailant had fled the scene). In any event, even if Officer Kiel's initial use of force was excessive, it was certainly not so excessive that no reasonable officer in his position could have believed it was lawful. *See United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (holding that officers did not use excessive force when, during the course of an investigatory stop, they tackled a suspect who was in full flight and then placed him in handcuffs once they had brought him to the ground); *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 393-95 (D.D.C. 2016) (holding that it was not clearly established that an officer used excessive force against a non-arrestee plaintiff when the officer shoved the plaintiff into a hot barbeque grill, resulting in burns, when the plaintiff had inserted herself between the officer and a person that the officer was attempting to arrest).

Second, it is undisputed that, after Officer Kiel grabbed and attempted to handcuff Mr. Wood, Mr. Wood raised his hand to the officers and refused to obey Officer Sekhon's command to

fall to the ground, and Officers Sekhon, Kiel, and Smith responded by tackling him to the ground. Wood Dep., ECF No. 43-9 at 22:21-24:5. As explained above, when Mr. Wood raised his hand to the officers when Officer Kiel was trying to handcuff him pursuant to the investigatory stop, the officers had probable cause to arrest Mr. Wood for APO. *See supra* Part III.A. Just as officers are permitted a reasonable amount of force to carry out an investigatory stop, they are permitted a reasonable amount of force to make an arrest. *Graham*, 490 U.S. at 396. But, in this Circuit, the amount of force deemed reasonable in the context of an arrest is markedly greater than the amount of force deemed reasonable in the investigatory stop context. *See, e.g.*, *Cromartie*, 479 F. App'x at 357 (holding that "the *ordinary degree* of physical coercion used by police officers to effectuate an arrest" was used when arrestee was "slammed to the ground, handcuffed, and forcibly kept on the ground by one or both officers") (emphasis added) (internal quotation marks omitted); *Oberwetter v. Hilliard*, 639 F.3d 545, 548, 555 (D.C. Cir. 2011) (holding that an officer did not use excessive force when he arrested a plaintiff who was dancing at the Jefferson Memorial by "ripping apart her earbud, shoving her against a pillar, and violently twisting her arm"); *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (holding that an officer did not use excessive force when she applied force to the arrestee's

29

arm to secure compliance during the arrest because the
arrestee's refusal to obey the officer's order prior to the
arrest suggested that the arrestee might try to resist or
escape); *Scott v. District of Columbia*, 101 F.3d 748, 759 (D.C.
Cir. 1996) (holding that the degree of force used to make an
arrest was not so excessive that no reasonable officer could
have believed in the lawfulness of his actions when an officer
struck an arrestee, a second officer joined the first officer in
slamming the arrestee to the ground, and then five officers
dragged the arrestee to a police transport vehicle); *Martin*, 830
F.2d at 262 (holding that an officer did not use excessive force
when he grabbed an arrestee about the waist, threw him into the
driver's seat of a car, and then slammed the door on his legs).
In view of the substantial amount of force the Circuit Court has
said officers can reasonably use to make an arrest, tackling Mr.
Wood after he raised his hand to the officers and refused to
obey a command to go to the ground is not excessive, let alone
so excessive that no reasonable officer could have believed that
use of force was lawful.

Third, it is undisputed that, after Mr. Wood was brought to
the ground, in an attempt to handcuff Mr. Wood the five officers
involved in the melee punched, grabbed, and pulled Mr. Wood and
he, in turn, was "hitting" them. Sekhon Dep., ECF No. 43-7 at
42:1-22; Smith Dep., ECF No. 43-8 at 28:15-29:21; Rodd Dep., ECF

No. 43-5 at 33:14-34:1; Wood Dep., ECF No. 43-9 at 26:10-21.
Drawing all reasonable inferences in Mr. Wood's favor, the Court
assumes that Mr. Wood did not start "hitting" until after the
officers began to hit him. Even so, the Court concludes that the
officers' use of force prior to the moment Mr. Wood was secured
in handcuffs was not so excessive that no reasonable officer
could have believed that use of force was lawful. As explained
above, the Circuit Court has repeatedly said that even severe
force is not clearly excessive in the arrest context,
particularly when an arrestee has already refused to obey an
order, as was the case here. *See Oberwetter*, 639 F.3d at 548,
555 (explaining that the plaintiff's refusal to stop dancing and
leave the Jefferson Memorial when ordered to do so was a primary
factor permitting the arresting officer "to take decisive action
to subdue [the plaintiff] quickly and forcefully, thereby
reducing the risk of interference or escape"); *see also
Cromartie*, 479 F. App'x at 357 (holding that it was not
excessive for officers to slam arrestee to the ground, handcuff
him, and forcibly keep him on the ground, "especially in light
of the fact that [the arrestee's] belligerence and disobedience
suggested he might try to resist or escape").

Fourth, Mr. Wood alleges that, after he was completely
handcuffed and had submitted to their authority, the officers
continued to punch, kick, and step on him. Wood Dep., ECF No.

43-9 at 15:4-6 ("I was handcuffed and I remember one of the officers just punching me and punching me."), 23:13-15 ("[W]hen I was on the ground they had me in handcuffs and still were stepping on me, punching me."). The officers, on the other hand, contend that any use of force ceased once Mr. Wood was handcuffed. Kiel Dep., ECF No. 43-4 at 35:10-15 ("A: At some point we were able to handcuff him. Yes. Q: And then what happened? A: We all immediately got off of him, assessed what the rest of the situation, and carried on with the investigation."). It is clearly established that punching, kicking, and stepping on a handcuffed and submissive arrestee is excessive force. *See Johnson*, 528 F.3d at 975 (holding that an officer who kicked a prone and submissive arrestee in the groin had used excessive force); *Arrington v. United States*, 473 F.3d 329, 331-33 (D.C. Cir. 2006) (holding, in a case where a suspect was punched, beaten with a baton, pistol-whipped, and attacked by a police dog, that such violence "was more force than was reasonably necessary" if the suspect had already been disarmed and handcuffed). Summary judgment here would be premature because there exists a genuine issue of material fact, namely, whether any of the five officers involved in the stop, arrest, and ensuing melee punched, kicked, or stepped on Mr. Wood after he had been completely handcuffed and had fully submitted to their authority by ceasing his own "hitting." Because resolution

of this dispute must be left to a fact-finder at trial, defendants are not entitled to summary judgment as to this version of Mr. Wood's excessive force claim. *See Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J., concurring in the judgment) ("Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official.").

### C. Common Law Claims

"The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim," *Scott*, 101 F.3d at 753-54, and, thus, "[c]onstitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action." *Amobi v. District of Columbia Dep't of Corr.*, 755 F.3d 980, 989 (D.C. Cir. 2014). Accordingly, if the probable cause exists that negates a Fourth Amendment false arrest claim, that same probable cause negates a common law false arrest claim. *See District of Columbia v. Minor*, 740 A.2d 523, 529 (D.C. 1999) (explaining that insufficiency of the evidence as to a Fourth Amendment false arrest claim "will effectively negate the common-laws false arrest claim"); *see also Smith v. United States*, 121 F. Supp. 3d 112, 119 (D.D.C. 2015) ("Under District of Columbia law, the existence of probable cause is an

affirmative defense that can be raised in response to an accusation of false arrest."), *aff'd*, 843 F.3d 509 (D.C. Cir. 2016). As explained above, the officers had probable cause to arrest Mr. Wood for APO. *See supra* Part III.A. That probable cause that entitles defendants to summary judgment as to Mr. Wood's constitutional false arrest claim likewise entitles defendants to summary judgment as to Mr. Wood's common law false arrest claim. And because there was probable cause for the arrest, defendants are also entitled to summary judgment as to Mr. Wood's common law malicious prosecution claim. *See DeWitt v. District of Columbia*, 43 A.3d 291, 295-96 (D.C. 2012) ("The existence of probable cause will likewise defeat a claim for malicious prosecution . . . .") (internal quotation marks omitted); *see also Amobi*, 755 F.3d at 992 ("We think our discussion of probable cause for the false arrest is sufficiently analogous so as to be dispositive on the malicious prosecution claim.").

Mr. Wood also asserts a common law assault claim against defendants. In the District of Columbia, an assault is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993). However, a "police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are

not in excess of those which the actor reasonably believes to be necessary." *Id.* (internal quotation marks omitted). Thus, "unless the threatened use of force is clearly excessive, an officer is protected against liability for assault." *Jackson v. District of Columbia*, 412 A.2d 948, 956 (D.C. 1980). "This standard is similar to the excessive force standard applied in the Section 1983 context." *Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998); *see also Harris v. Allison*, No. 14-1104, 2016 WL 3166296, at *4 (D.D.C. June 6, 2016) ("[A]n assault claim against D.C. law enforcement officials should be held to the same standard as its federal counterpart——an excessive force claim under 42 U.S.C. § 1983."). Accordingly, because there is a genuine dispute as to a material fact concerning the officers' use of force after Mr. Wood was handcuffed and had fully submitted to their authority, as with the § 1983 excessive force claim, defendants are not entitled to summary judgment as to the common law assault claim. *See Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 27-28 (D.D.C. 2011) (denying a defendant's motion for summary judgment as to a District of Columbia assault and battery claim "for the same reasons [relied upon] in analyzing [plaintiff's] excessive force claim under § 1983").

## IV.  Conclusion

For the reasons stated above, the Court will **GRANT IN PART**
and **DENY IN PART** defendants' motion for summary judgment. A
separate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**     **Emmet G. Sullivan**
             **United States District Judge**
             **May 31, 2017**